# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

## No. 19-1047V

(to be published)

| | | |
|---|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* | | |
| DARREL LAURETTE, | \* | Chief Special Master Corcoran |
| | \* | |
| Petitioner, | \* | |
| | \* | Dated: November 21, 2022 |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH | \* | |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* | | |

*Bruce W. Slane*, Law Office of Bruce W. Slane, P.C., White Plains, NY, for Petitioner.

*Martin C. Galvin*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On July 18, 2019, Darrel Laurette filed a petition seeking compensation under the National Vaccine Injury Compensation Program ("Vaccine Program").[2] Petitioner alleges he suffered a left Shoulder Injury Related to Vaccine Administration ("SIRVA") following receipt of an influenza ("flu") vaccine on October 21, 2016. Petition (ECF No. 1) ("Pet.") at 1. The matter was originally assigned to the Special Processing Unit (the "SPU"), but the parties could not resolve the claim (mainly because it involves a potentially large damages component dispute). Accordingly, the case was transferred out of SPU and to my individual docket.

---

[1] This Decision will be posted on the Court of Federal Claims' website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012)). **This means that the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

I proposed that the underlying issue of entitlement could reasonably be decided on the record, and the parties have offered briefs in support of their respective positions. Petitioner's Motion, dated April 29, 2022 (ECF No. 79) ("Mot."); Respondent's Opposition, dated June 29, 2022 (ECF No. 84) ("Opp."); Petitioner's Reply, dated July 5, 2022 (ECF No. 85). Now, after review of the medical records and briefs, I **GRANT** entitlement, because Petitioner has established the Table elements for a SIRVA claim

## I.    Factual Background

Petitioner was born on July 22, 1977, and was thus thirty-nine years old when he received the flu vaccine on October 21, 2016, as a requirement of his employment. *See generally* Ex. 3 (Petitioner's Affidavit, dated July 17, 2019) (ECF No. 7-3)); *see also* Ex. 2 at 2–4; Ex. 7 at 31. At that time, he had been working as a lead radiological technician/mechanic for Revels Contracting Services ("Revels"), and his job entailed extensive physical activity installing medical equipment. Ex. 7 at 31; Ex. 35 at 1–3.

There are no medical records close-in-time to the vaccination event, and thus no immediately-contemporaneous evidence of any purported symptoms relating to the vaccination. In fact, the first record evidence of any injury at all is found in a communication between Mr. Laurette and Revels from December 9, 2016, when someone emailed him in response to a voice message that he had left indicating that he had left shoulder pain and was planning to seek medical attention. Ex. 27 at 239.[3] The next day (December 10th), Mr. Laurette went to an urgent care facility and was seen by Bruce Chaney, P.A. Ex. 5 at 1–3. He now reported a six-week history of left shoulder pain "caused by having a flu injection in that shoulder," and described the pain as "aching and moderate," 5/10 at rest but more painful with movement. *Id.* (six weeks from this date would be late October 2016). Petitioner was assessed with unspecified left arm pain, and he received a prescription for a methyl prednisone dose pack and Percocet. *Id.* at 2-3.

Despite the above, Petitioner continued in December 2016 to travel for his position. *See, e.g.*, Ex. 35 at 3. However, he informed Revels a few days after his urgent care visit that although his pain had subsided somewhat, it was still present. Ex. 27 at 239–47. He also indicated an intent to pursue redress, either through a Vaccine Program claim or a workers compensation claim. *Id.* at 241. Later in December, Petitioner determined that (while on travel for a job assignment) his

---

[3] Respondent's brief suggests that Petitioner's decision to seek treatment for the alleged shoulder pain may have been motivated in part by litigation concerns. Thus, records filed in this case establish that on December 8, 2016, Petitioner's counsel signed a retainer agreement regarding the instant case that was fully executed by the end of the month. Ex. 18 at 4. However, I do not find in this case that the proof of Table onset offered by Petitioner has been outweighed by a suggestion from the record that Petitioner's desire to pursue a claim was why he decided to seek treatment. In fact, it is just as likely that Petitioner's *awareness* of his pain was what led him to explore legal avenues of redress; that conclusion is not rebutted by Petitioner's delay in seeking treatment.

shoulder pain was too severe for work, and he returned home. Ex. 27 at 256. Petitioner thereafter ceased working for Revels entirely (although the parties appear to dispute whether this reflected Petitioner's personal decision to quit or was due to the severity of his SIRVA injury). He was not formally terminated until August 2017, however, and the record reveals he later found other employment in 2018. *Id.* at 322; Ex. 3 at 4.

Beginning in January 2017, Petitioner began to receive more consistent treatment for his alleged SIRVA. Thus, on the early evening of January 3, 2017, he took himself to the emergency department of an urgent care center complaining of left shoulder pain. Ex. 6 at 12. The intake record indicates that his pain was moderate, and that onset had occurred three weeks before (and hence if true well *after* the vaccination at issue if true)—although the identified "mechanism" for the injury was an unspecified "injection" (and there is no record evidence that Petitioner received an immunization the prior month). *Id.* Dr. John Torres, M.D., however, evaluated petitioner during this visit, and the records of his exam are more specific about onset. He thus noted that the reported onset of pain was "Oct 2016" after receipt of a flu vaccine, with duration of pain "for 3 month(s)." Ex. 6 at 14.

Dr. Torres ordered a left shoulder x-ray, but the x-ray did not show any abnormalities. Ex. 6 at 16. A physical exam revealed: "clavicle: negative for swelling and ecchymosis, deformity, tenderness and crepitus. Shoulder: positive for left side tenderness and limited ROM. Negative for left side swelling, ecchymosis, deformity and dislocation." *Id.* at 15–16. Range of motion was limited by pain only, and passive range of motion was intact. *Id.* There was limited abduction in active range of motion. *Id.* There was no shoulder tenderness. *Id.* Dr. Torres could not identify a cause for Petitioner's symptoms, and Petitioner was discharged (at which time he now reported no pain at all). *Id.* at 14, 16–17.

Two days later (January 5, 2017), Mr. Laurette was evaluated by a physician for a workers compensation claim. Ex. 7 at 56. He reported that "after" receiving the flu vaccine that Revels had mandated for employees, he had lost "mobility in [his] arm" and was experiencing a "constant ache in bicep," as well as "crippling pain when [his] elbow [was] raised above [his] shoulder." *Id.* at 31. He described the pain as travelling from the "middle of [the] shoulder to [the] elbow" and that he had "burning" and "shooting" pains. *Id.* at 32. He also described having a "constant ache and throb" in his left arm 5-6/10, worsening to 9/10 with above-the-shoulder movement. *Id.* Petitioner was assessed with pain after the vaccination. *Id.*

In the ensuing months, Petitioner continued to obtain treatment for his reported pain and movement issues. *See, e.g.*, Ex. 7 at 23 (January 19, 2017, visit with workers compensation physician); Ex. 9 at 12–14 (January 31, 2017, visit to orthopedist). By February 2017 he began consulting with a physical therapist (Ex. 10 at 3–4, 23). He reported ongoing pain and difficulties with movement—although that he was unable to wash his back, participate in activities where he

3

would "take some force or impact" from his "arm, shoulder or hand," or sleep due to pain. *Id.* The record from the initial consultation (conducted on February 8, 2017) memorializes Petitioner's assertion that the October 2016 vaccination "hurt more than normal," and that he felt worsening pain "The next day when he tried to do his job which is mainly done overhead." *Id* at 23. Five weeks later, he could not lift his arm over his head. *Id.* Petitioner continued PT for twelve visits but was discharged on April 15, 2017, due to lack of progress. *Id.* at 11–36.

Petitioner's treatment efforts continued on into the spring, as memorialized in the parties' briefs. *See, e.g.*, Mot. at 11–20; Opp. at 4–13. In summary, Petitioner received fairly conservative treatments overall (in part due to the fact that he lacked insurance or other resources needed to pay for medical services). By November 2017, he had received a steroid shot for his shoulder pain. Ex. 15 at 6–7. He underwent additional PT in the early winter of 2018. *Id.* at 21–83. Eventually in 2018, Petitioner received the diagnosis of subacromial bursitis, and that summer underwent a left shoulder arthroscopy. Ex. 16 at 33–36, 42–44. He experienced post-surgical PT into the fall of 2018, and has since then experienced lingering weakness and intermittent pain (although there is ample evidence that he mostly felt recovered after the surgery). Mot. at 19–20.

Besides the medical records themselves, Petitioner has offered several witness statements and declarations in support of his claim. *See generally* Ex. 3, Ex. 4 (Affidavit of Amanda Laurette, dated July 17, 2019 (ECF No. 7-4)), Ex. 29 (Petitioner's Supplemental Affidavit, dated November 9, 2020 (ECF No. 46-1)), Ex. 35 (Petitioner's Further Supplemental Affidavit, dated April 26, 2022 (ECF No. 77-1)), and Ex. 36 (Affidavit from Robert Thane, dated April 28, 2022 (ECF No. 77-2)).

These witness statements contain a number of representations relevant to the onset question. In his initial affidavit, Petitioner avers that he felt pain immediately upon vaccination, and which worsened the next day. Ex. 3 at 1–2. He worked in October and November but found the pain made it impossible to do his job, requiring him to rely on an unnamed "understudy." *Id.* at 2. By December 2016, the pain had become unbearable, leading him to seek the medical interventions described above. *Id.* Petitioner explained the seven-week delay in seeking treatment as attributable to his hope that the pain would subside. Ex. 29 at 1. He also later averred that the need to travel for his job also interfered with his ability to seek medical care for his pain. Ex. 35 at 1. In that final affidavit, Mr. Laurette identified his work "understudy" as Robert Thane. *Id.* at 2.

Petitioner's wife recalls being informed of his pain close in time to the vaccination event, and that she observed him in pain when attempting to sleep and having difficulty with a number of activities thereafter. Ex. 4 at 1–2. Mr. Thane himself was able to aver his presence at the time of vaccination (since he also received the flu shot on October 21, 2016), and therefore observed Petitioner's immediate pain. Ex. 36 at 2. And Mr. Thane was personally present with Petitioner during travels for Revels when equipment was to be installed, and thus was aware of Petitioner's

4

inability to perform certain tasks associated with the installation due to his pain. *Id.* at 2–3.

## III.     Procedural History

After the case's initiation in the summer of 2019, it was assigned to SPU, since it asserts a SIRVA claim—a kind of vaccine injury that routinely results in settlement or other prompt resolution. But the case languished in SPU thereafter for several years, as the parties gathered additional records and attempted unsuccessfully to settle the claim. I determined in February 2022 to transfer the matter out of SPU, but to my own docket (*see* Order (ECF No. 74)), and then set a scheduling order for briefing on entitlement. That matter is now ripe for resolution.

## IV.     Applicable Legal Standards

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table— corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[4] In this case, Petitioner asserts a Table claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

---

[4] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records (or, when appropriate, by a medical opinion). *Id.* To resolve factual issues, the special master must weigh the evidence presented, which may include evaluation of contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 204 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014) (citing Section 12(d)(3); Vaccine Rule 8).

Medical records are generally viewed as particularly trustworthy evidence since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). But they do not compel an outcome. Section 13(b)(1). A petitioner may in fact overcome facts set forth in a record with testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

## ANALYSIS

Respondent makes two arguments against Petitioner's Table showing. First, he denies that onset of Petitioner's pain occurred within 48 hours of vaccination. Opp. at 15–16; *see* 42 C.F.R. § 100.3(c)(10)(ii); *see also* 42 C.F.R. § 100.3(a)(XIV)(B) (requiring the first symptom or manifestation of onset within 48 hours of vaccination for a SIRVA injury following receipt of a flu vaccine). Second, he contends that Mr. Laurette's pain was not limited to his vaccinated left shoulder. 42 C.F.R. § 100.3(c)(10)(iii). The record preponderantly rebuts both arguments.

First, the overall record, supplemented with the witness affidavits, demonstrates it is more likely than not that Petitioner's pain began within 48 hours of vaccination. The evidence from December 2016/January 2017 establishes that Petitioner complained of pain since vaccination. Moreover, these records obtain support from Petitioner's own affidavit plus those submitted by his wife and work colleague. This (plus the absence of preponderant contrary evidence suggesting a later onset) is a sufficient basis for a favorable onset determination.

Respondent maintains that Petitioner's nearly two-month delay in seeking treatment undercuts this finding. But (and as I have routinely noted), delay in treatment not only does not prevent a favorable Table onset finding, but it is also almost *to be expected* in the context of a SIRVA injury. *Bergstorm v. Sec'y of Health & Hum. Servs.*, No. 19-0784V, 2020 WL 8373365, at *3 (Fed. Cl. Spec. Mstr. Dec. 4, 2020). Claimants simply do not always comprehend that a

vaccination may have harmed them, and/or believe that vaccination pain will be transient, and therefore often delay treatment (sometimes based on advice of medical professionals). *See e.g.*, *Meagher v. Sec'y of Health & Hum. Servs.*, No. 18-1572V, 2021 WL 1293189, at *4 (Fed. Cl. Feb. 9, 2021) (more than two-month treatment delay did not undermine Petitioner's onset assertions); *Williams v. Sec'y of Health & Hum. Servs.*, 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019) (noting Petitioner's delay in treatment was the result of her underestimating the severity of her injury). Moreover, the Act clearly anticipates the fact that onset questions often require consideration of evidence that temporally falls outside the relevant time period. *See* Section 13(b)(2) (a special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period").

Respondent also suggests that Petitioner's physical labor-intensive job (which he engaged in during the treatment gap at issue) undercuts the argument that he was likely living with pain in the timeframe between vaccination and his first visit to a treater to address the putative pain. But Petitioner has persuasively established, via the offered witness affidavits, that he was forced to rely on assistance from a work colleague for physical acts that were too painful to perform. *See generally* Ex. 36. At most, the fact of Petitioner's treatment delay goes to overall severity when calculating damages components like actual pain and suffering—and while I will give the delay some weight when evaluating what would be the proper pain and suffering award, it does not prevent a favorable onset finding. Otherwise, there are no records that are inconsistent with Petitioner's claims of Table onset (e.g., that would suggest an onset outside the timeframe). While some records are inexact, that too is not uncommon when a claimant first starts to inform treaters when onset began. Overall, the evidence preponderates in favor of a Table onset.

Second, Respondent contends that the record does not establish that Petitioner's injury was limited to his shoulder. Opp. at 16. But (as I have previously noted), even when records indicate pain elsewhere in the arm, or describe "radiating" pain, I have routinely held that the Table requirement is met as long as evidence *also* is consistent in describing shoulder pain. *Stromer v. Sec'y of Health & Hum. Servs.*, No. 19-1969V, 2022 WL 1562110, at *7 (Fed. Cl. Spec. Mstr. Apr. 8, 2022) (finding that most of Petitioner's records support a finding that his pain was limited to the left shoulder, despite several references to radiating pain as well). Here, that is the case— and to the extent Petitioner's history describes pain unrelated to his SIRVA, such a discrepancy presents a matter than can be resolved when calculating damages.

Respondent does not dispute any remaining Table SIRVA requirements, and the record contains sufficient evidence showing Petitioner has satisfied them. *See* 42 C.F.R. § 100.3(c)(10)(i) & (iii)-(iv). A thorough review of the record in this case does not reveal a prior or current condition or abnormality which would explain Petitioner's condition or pain and limited range of motion

("ROM") other than in Petitioner's injured left shoulder. Thus, all elements of a Table SIRVA claim have been preponderantly established.

Because Petitioner has satisfied the requirements of a Table SIRVA, he need not prove causation (and for this reason I given no consideration to Respondent's arguments about Petitioner's success in that regard). Section 11(c)(1)(C). However, he must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of his injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence which fulfills these additional requirements.

## CONCLUSION

Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is thus entitled to compensation. **The parties are hereby ordered to contact Chambers on or before December 2, 2022, to set a mutually-acceptable date for a status conference to discuss the resolution of damages.**

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master