# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1047V

| | |
|---|---|
| * * * * * * * * * * * * * *<br>DARREL LAURETTE,<br><br>Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH<br>AND HUMAN SERVICES,<br><br>Respondent.<br>* * * * * * * * * * * * * * | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Chief Special Master Corcoran<br><br><br><br>Filed: March 25, 2024 |

*Bruce W. Slane*, Law Office of Bruce W. Slane, P.C., White Plains, NY, for Petitioner.

*Camille Collett*, U.S. Department of Justice, Washington, DC, for Respondent.

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DAMAGES**[1]

On July 18, 2019, Darrel Laurette filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges he suffered a left Shoulder Injury Related to Vaccine Administration ("SIRVA") following receipt of an influenza ("flu") vaccine on October 21, 2016. Petition (ECF No. 1) ("Pet.") at 1. The matter was originally assigned to the Special Processing Unit (the "SPU"), but the parties could not resolve the claim. After the case was transferred out of SPU and to my individual docket, I determined Petitioner was entitled to damages. *See* Ruling on Entitlement, dated Nov. 21, 2022 (ECF No. 88) (the "Entitlement Ruling").

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

With one exception,³ the parties have been unable to resolve damages on their own, and have now briefed their respective positions. Petitioner's Damages Brief, dated July 6, 2023 (ECF No. 116) ("Br."); Respondent's Brief, dated Oct. 3, 2023 (ECF No. 120) ("Opp."); Petitioner's Reply, dated Oct. 17, 2023 (ECF No. 128) ("Reply"). For the reasons set forth in greater detail below, I award $130,000.00 for actual pain and suffering, plus the amount of $6,342.93 to satisfy a Medicaid lien (which shall be included in a formal decision, to be issued after the parties provide information about the lien payee). I do not award any lost earnings.

I.      **Brief Factual Summary**

The medical record summary and fact-findings contained in the Entitlement Ruling are incorporated by reference. *See generally* Entitlement Ruling at 2–5. In short, Petitioner was nearly 40 when he received the flu vaccine on October 21, 2016, as a requirement of his employment. Ex. 2 at 2–4; Ex. 3; Ex. 7 at 31. At that time, he had been working as a lead radiological technician/mechanic for Revels Contracting Services ("Revels"), and his job entailed extensive physical activity installing medical equipment. Ex. 7 at 31; Ex. 35 at 1–3.

After a six-week lag, Petitioner began seeking treatment for shoulder pain he suspected was vaccine-related, because he had been experiencing symptoms since the vaccination in October. Ex. 5 at 1–3. He continued to work through this period, but eventually determined he could no longer perform his work-related tasks. Ex. 27 at 239–47, 256. Petitioner thereafter ceased working for Revels entirely (although the parties appear to dispute whether this reflected Petitioner's personal decision to quit or was due to the severity of his SIRVA injury). He was not formally terminated until August 2017, however, and the record reveals he later found other employment in the spring of 2018. *Id.* at 322; Ex. 3 at 4.

I ultimately determined in my Entitlement Ruling that Petitioner had met the Table elements for a SIRVA. Entitlement Ruling at 8–9. I did note, however, that Petitioner's treatment delay would be deemed a relevant consideration when evaluating the pain and suffering damages component. *Id.* at 8. That delay gets properly balanced against the fact that Petitioner ultimately underwent surgery in the summer of 2018 (although his overall treatment course was nevertheless conservative in nature). *Id.* at 4. Notably as well, this is not a case in which the claimant received multiple rounds of steroid injections. Rather, it appears he received his first such treatment in May of 2023 Br. at 22. (It is likely, however, that conservative treatment might in part be explained by both insurance coverage issues plus the imposition of the Pandemic in the winter of 2020—and there is also record evidence that the Petitioner received some oral steroidal medications).⁴

---

³ The parties agree that a Medicaid lien sum in the amount of $6,342.93 should be included in the award, and therefore that sum is not in dispute.

⁴ There is also record evidence Petitioner received a lidocaine injection in May 2018 (Ex. 9 at 4), but this is a local

**II.      Relevant Law on Damages Determinations**

   A.  *General Considerations*

A petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(A)(i) –(iii). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

   B.  *Pain and Suffering*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996).

Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)). I may consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009). And, of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision from several years ago. *Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 589–90. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593–95. Under this alternative approach, the statutory cap merely cuts off higher pain and suffering awards—it does not shrink

---

anesthetic not congruent with a steroid injection.

3

the magnitude of all possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it offers a reasoned understanding of the issues involved in pain and suffering calculations, and underscores the importance of evaluating pain and suffering *first and foremost* on the basis of the injured party's own experience.

In another recent decision, I discussed at length the legal standard to be considered in determining pain and suffering awards specifically in the SIRVA context. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Henderson v. Sec'y of Health & Hum. Servs.*, No. 20-1261V, 2023 WL 2728778 (Fed. Cl. Spec. Mstr. Feb. 28, 2023).

C. *Lost Wages – Past and Future*

The Vaccine Act provides for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections," where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). The calculation of lost earnings damages must be performed in a "cautious manner 'in accordance with generally recognized principles and projections.'" *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (citing Section 15(a)(3)(A)). As controlling federal case law provides (and Petitioner accepts), requested lost wages must be net of taxes and related offsets. *See Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983) (*citing Norfolk & Western R. Co. v. Liepelt*, 444 U.S. 490 (1980).

Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Sept. 17, 2015) (indicating Section 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation" and thus refusing to allow lost wages on a planned business venture that was too indefinite); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020 (citing *J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with *some* evidence, if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g., Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

II.  **Appropriate Compensation in this Matter**

Petitioner seeks both aspects of pain and suffering damages—present/past and future. In terms of actual pain and suffering, he requests $230,000.00, plus a future component that (assuming it was subsequently reduced to present value) would equal more than $20,000.00—meaning Petitioner in total requests the maximum amount of pain and suffering allowed in the

4

Program. Br. at 31. Petitioner also seeks $104,040.19 for past lost earnings, inclusive of tax offsets, calculated through May 2022.

Respondent maintains Petitioner should receive no more than $115,000.00 in actual pain and suffering—with no future component. Opp. at 17. And he denies Petitioner is entitled to *any* lost earnings sum.

### A. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact awareness of his injury. Therefore, I analyze principally the severity and duration of the injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of *this case*.

*Petitioner's Argument*

Petitioner observes that his medical record reveals a treatment course that (he maintains) lasted more than six years, ultimately resulting in surgery in June 2018. Br. at 25. Before surgery, he attended 27 physical therapy ("PT") sessions and displayed range of motion limitations throughout the period. *Id.* at 26. He also attended 25 more PT sessions post-surgery, while engaging in his own home exercise regime thereafter. *Id.* He also maintains he experienced a labral tear post-surgery that he attributes to his therapy course (and hence is an indirect and additional vaccine-related sequela). *Id.* at 26. The impact of injury on his career was also significant. *Id.* And his injuries continue to cause him problems today. *Id.* at 26–27.

Petitioner compares his suffering to the claimants in several prior Vaccine Act cases. *Peterson v. Sec'y of Health & Hum. Servs.*, No. 20-1649V, 2023 WL 359116 (Fed. Cl. Spec. Mstr. May 23, 2023) (awarding $130,000.00 for pain and suffering, where Petitioner underwent arthroscopic debridement and subacromial decompression and where Petitioner asserted that his injury caused pain and limited ROM for nearly four years); *Lagle v. Sec'y of Health & Hum. Servs.*, No. 16-1053V, 2023 WL 3035370 (Fed. Cl. Spec. Mstr. Apr. 21, 2023) (awarding $130,000.00 for pain and suffering based on seven-year course, featuring rotator cuff repair and acromioplasty, plus multiple doctor's appointments, physical therapy, an MRI, and a steroid injection); *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) ($185,000.00 awarded for pain and suffering—over three-year course plus steroid injections, physical therapy, and prescription narcotic pain medication); *Reed v Sec'y of Health &*

5

*Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00).

Notably, the sums awarded in these cases are less than what Petitioner requests, however. And other than tallying up the total number of PT and doctor's visits he experienced, along with emphasizing the comprehensive nature of the surgical procedure he underwent, Petitioner has not provided any comparable case in which a similarly-situated claimant who incurred a SIRVA received more than $200,000.00 for actual pain and suffering.

For the future component of pain and suffering, Petitioner argues that his symptoms persist to this day (and presumably are likely to continue onward). Br. at 31. He references in support another decision from several years ago, *Curri v. Sec'y of Health & Hum. Servs.*, No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). That claimant received a future component pain and suffering award of $550.00 per year (reduced to present value to the total sum of $10,254.11). *Curri,* 2018 WL at *6–7. However, the *Curri* petitioner (a young mother) had received written medical evaluations concluding that additional treatment (which featured surgery) could not assist her, leaving her with a permanent "scheduled loss of use" of 22.5 percent of her left arm. *Id.* at *2. Petitioner nevertheless maintains that an award of more than $20,000.00 is appropriate (although he does not provide a calculation for the total sum's reduction to net present value—and therefore it is not clear whether the sum is a gross or net figure).

*Respondent's Argument*

Respondent (perhaps in recognition of my observation in numerous SPU cases that SIRVA claims involving an invasive surgery procedure—as here—should generally result in a pain and suffering award in the six figures) cites a number of factors specific to this case to justify his proposed $115,000.00 award. For example, he notes that the record shows that as of December 2016, Petitioner had already made the determination to sue on his injury. Opp. at 2. Petitioner otherwise continued to work for Revels from the date of vaccination into December 2016, and initially characterized his pain as moderate. Ex. 5 at 1–3. And his decision that same month to cease working was unilateral, and not based upon the advice of a medical professional. Ex. 27 at 256.

Thereafter, early treatment of Petitioner's symptoms revealed moderate pain and no identifiable issues on imaging. Opp. at 3–4. An occupational health evaluation[5] received by Petitioner in January 2017 led to him being authorized for work, albeit with lifting and other physical restrictions, and recommendations for conservative treatment overall. *Id.* at 4–5. Nevertheless, Petitioner began to report other daily life limitations, and the PT he began that winter

---

[5] Petitioner did make a workers' compensation claim for his injury, but has represented that it was denied because it was not deemed work-related. Ex. 35 at 4.

was concluded in April 2017 due to lack of progress. *Id.* at 6. Petitioner continued to complain of mild pain and range of motion limits in 2017, but a lack of imaging confirmation of his injuries resulted in no treater recommendations for more intrusive medical interventions. *Id.* at 6–10.

By the spring of 2018 (now 18 months since vaccination), Petitioner reported that he was doing much better after some additional PT sessions, and he was provided medical authorization to return to work with no restrictions. Opp. at 10. However, his symptoms re-emerged after pushing open a door in May 2018, and he was now deemed an appropriate candidate for a surgery to treat subacromial bursitis. *Id.* at 11. The record thereafter shows improvement from surgery—and although Petitioner had personal misgivings about his capacity to work, treaters suggested he was likely to see additional improvement with PT. *Id.* at 12; Ex. 26 at 29–32 (August 2019 record from orthopedic visit). After another significant gap (January 2020 to September 2021) Petitioner began seeking treatment again for worsened symptoms. *Id.* at 13. But his complaints were not confirmed with additional imaging, and in May 2022 was again deemed able to work. Opp. at 14.

Given the foregoing, Respondent maintains that a lower pain and suffering award is merited. The record shows Petitioner tolerated his injury for several weeks before seeking treatment. Opp. at 18. And although he did ultimately require surgery, he experienced a good recovery overall. *Id.* at 19. For comparable cases, Respondent cites two determinations from the SPU "Motions Day" context. *See Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 in surgery case); *Shelton v. Sec'y of Health & Hum. Servs.,* No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding $97,500.00). He also argues that Petitioner's comparable cases are distinguishable, noting that the two featuring higher awards (*Reed* and *Hooper*) were not issued in the context of my effort through "Motions Day" SIRVA adjudications to systematize pain and suffering awards. Opp. at 20–21.

*Analysis*

In this case, there is a more than $100,000.00 "gap" between the parties' pain and suffering demands—but the actual range is far more narrow, once each side's demands are scrutinized. Respondent for his part cites two pain and suffering determinations, *Hunt* and *Shelton,* that I have previously noted on several occasions stand as outlier determinations, and rare instances of deviating from the above-$100,000.00 "norm" for SIRVA cases involving surgery. *Kestner v. Sec'y of Health & Hum. Servs.*, No. 20-0025V, 2023 WL 2447499, at *6 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). Indeed, Respondent's own offered sum exceeds these awards.

Petitioner, however, has not persuasively defended his requested figure either. *Hooper* and *Reed* were not decided in connection with my effort via "Motions Day" to generate a body of determinations that could provide litigants with reasonable illustrations of the kind of awards

appropriate in comparable SIRVA cases. The other two cases, however, are not only more recent determinations, but stand as better comparable cases. Although, I note that *Peterson* and *Lagle* were also not rendered in the contexts of a "Motions Day" hearing.

Here, I find that both of these decisions are good comparable adjudications, and stand as fair exemplars for what a reasonable, actual pain and suffering award should be in this case. I determined that the *Peterson* petitioner experienced a relatively mild injury, yet one still requiring surgical intervention. 2023 WL 3591166, at *10. Moreover, based on that petitioner's moderate restrictions in ROM and pain, coupled with the length of time between vaccination and surgery, I found that an award of $130,000.00 for actual pain and suffering represented a fair and appropriate amount. *Id.* at *11. In *Lagle*, the special master held that the petitioner "demonstrated that his initial pain was severe, but the records show that post-surgery his pain symptoms had decreased and range of motion had improved" 2023 WL 3035370, at *8. There, the petitioner also had an approximate five-year gap in treatment and was ultimately awarded $130,000.00 for his actual pain and suffering. Thus, as the instant case also involved surgery, but which featured overall conservative treatment, moderate pain overall, and some delay in initially seeking treatment, an award of $130,000.00 is fair.

The request for a future component, however, is far less well-substantiated. I generally have not included a future component in pain and suffering awards in SIRVA cases absent clear (and persuasive) record proof of a permanent disability or limitation—as *Curri* illustrates. *Curri*, 2018 WL 6273562 at *2; *Smith v. Sec'y of Health & Hum. Servs.*, No. 19-1384V, 2022 WL 3012503, at *7 (Fed. Cl. Spec. Mstr. June 29, 2022) (finding a future pain and suffering component is justified primarily because petitioner's treating orthopedist diagnosed petitioner with a permanent post-surgical disability resulting from his vaccine injury). No such evidence is to be found in this record. In addition, there are too many lengthy post-surgery treatment gaps in this record for me to be able to conclude that preponderant evidence establishes that Petitioner's *current* reported pain and condition is related to a SIRVA which occurred *seven* years ago. Nor has Petitioner explained clearly how the figure was calculated, and/or what it would be if reduced to net present value. And the restoration of his job (which I already found he could not perform closer-in-time to the start of the SIRVA) undercuts the contention of long-lasting and impairing sequelae. Accordingly, no future pain and suffering component is justified based on Petitioner's showing.

**B. Lost Wages**

*Petitioner's Argument*

Petitioner spends more time in his brief *calculating* his lost wage demand than justifying it. To determine his proposed sum, Petitioner has filed payroll and employment records, W-2 and

8

tax statements from 2011 to 2020, a certified itemized statement of earnings from the SSA, as well as a supplemental affidavit. *See generally* Exs. 51–60. He measures the actual lost wages component from January 7, 2017 (when he ceased receiving compensation from Revels) to May 31, 2022 (when he was, purportedly, medically cleared to return to work—although there is medical record proof that Petitioner received clearance to work as early as the spring of 2018—even though he underwent surgery only a few months later). Br. at 32; Ex. 15 at 87 (medical record from 3/2/2018 follow-up orthopedics appointment stating that "letter [was] provided to patient to return to work with restriction of no overhead lifting"). In effect, Petitioner seems to concede, at a minimum, that post-May 2022 he was physically able to perform the same tasks he had while employed by Revels pre-vaccination, and therefore that date constitutes the end-point for any lost wages calculation (even if he was not formally rehired by Revels until December 2022).

Petitioner thus (based on a rate of $21.75 per hour, and assuming a 40-hour work-week plus some overtime) calculates he would have received $55,027.00 yearly (from January 2017 to May 2022) if employed by Revels. Br. at 32. By comparison, at the substitute job he was able to perform beginning in March-April 2018 (working at an RV park), he earned somewhere between $27,000.00 and an estimated higher sum (based on a putative entitlement to overtime work) of $32,850.00. *Id.* at 33. Relying on these figures, Petitioner has calculated his lost wages for the 2017 to mid-2022 period (subtracting actual wages and overtime from what he could have earned at Revels) to be $118,965.00. *Id.* He then offsets the sum with expected tax obligations, reducing it to $104,040.19. *Id.* at 33–34. Notably, however, it does not appear Petitioner obtained the replacement job until the spring of 2018—and hence his lost wages calculation includes a lengthy period of time in which he not only did not work but did not *attempt* to work. And there is some evidence as well that in 2018 Petitioner received some kind of lost wage compensation via his employer. Ex. 51 at 1; Ex. 61 at 69–75, 129–33.

*Respondent's Argument*

Respondent's refusal to acknowledge that Petitioner should receive any lost wages has several grounds (although they are set forth in the space of one paragraph). Opp. at 21–22. First, Respondent contends that Petitioner's ultimate separation from Revels was not solely due to his injury, but rather the product of conduct unrelated to his SIRVA (in particular, the failure to communicate with his employer about his status over time). *Id*. Second, he purports that Petitioner did not mitigate his wage loss (although the record does show he accepted alternative employment). Thus, Petitioner effectively abandoned his worker's compensation claim, by not substantiating it despite due opportunity. *Id.* at 22, *citing* Ex. 27 at 256, 322. He also possessed disability insurance in the relevant timeframe, but has not filed evidence in this case substantiating whether he in fact received payments that might offset compensation losses. Respondent otherwise provides no comment on Petitioner's methodology for calculation of lost earnings in this case.

9

*Petitioner' Reply*

To bulwark the lost earnings demand, Petitioner cited additional evidence from the record, including some documents not discussed in his initial brief. *See generally* Reply at 5–12. He references evidence from Revels, for example, acknowledging the need for work accommodations during the relevant period. *Id.* at 5. And although in the spring of 2017 the need for medical clearance before Petitioner began working again was noted (Ex. 11 at 23), he did not receive full medical clearance before May 2022 (although there is earlier record evidence calling that date into doubt), and also that thereafter Revels readily rehired him once such clearance was provided. *Id.* at 5–6. As far as damages mitigation goes, he emphasizes that he did work for most of the relevant timeframe (except January 2017 to March 2018—a period for which he *does* demand lost wages).[6]

In addition, Petitioner explains that his worker's compensation claim was not fully pursued mainly because he determined that the vaccination at issue (which elsewhere in his pleadings he deemed an employment obligation) was also for his own health, rendering it not "work-related," and thus the fact the worker's compensation claim was not ultimately pursued cannot reasonably be held against him. Reply at 6–7. For his disability insurance payouts, Petitioner maintains that the relevant records existed but were not filed while entitlement was pending. *Id.* at 7. He has since filed them, however, and he notes he received only $3,030.59 for short-term disability pay (offset by attorney's fees paid to collect the sum), but was otherwise denied all long-term disability pay except for three weeks in April 2017, in the amount of $1,349.00. *Id.* at 8. He adds that the claim was advanced and resolved before his 2018 surgery (which arguably would have corroborated the claim more convincingly). *Id.*

Otherwise, Petitioner asserts that even full payments of short or long-term disability sums would not have mitigated wholly his lost wages. Reply at 9. Rather, the policies would have entitled him to no more than 60 percent base pay, with no provision for overtime, leaving more than eighty percent of the demanded sum still available. (It otherwise does not appear, however, that Petitioner's lost wage demand sum as set forth in the Reply has been reduced by the disability sums he acknowledges he did in fact receive). But he offers a recalculation of his wages claim based on some of these acknowledged offsets, reducing the total claim to $86,232.39. *Id.* at 12.

*Analysis*

Despite its facially-simple calculation of "potential wages minus actual wages," Petitioner's lost earnings demand is difficult to parse and not completely well-substantiated – especially given the record evidence. That record suggests that Petitioner made a unilateral

---

[6] Petitioner specifically maintains in the Reply that he is "not claiming any lost wages that he could have mitigated" (Reply at 6)—and yet his lost damages calculations *includes* the period of time he did not work at all, without any showing that he could have earned some employment compensation of some kind in this timeframe.

10

decision in December 2016 to stop working at Revels. Admittedly, that choice has some common-sense character to it given the nature of his work (and indeed, in finding entitlement I did determine the presence of record evidence suggesting Petitioner was then experiencing enough pain to cause him to be unable to perform his duties that fall). Entitlement Ruling at 7, 8. Yet it is wholly unclear from this record as well that Petitioner *could not* work due to the SIRVA, or that no alternatives were available to him at Revels. His claim of complete work-related impairment is not backed up with sufficient treater opinion evidence to corroborate the putative physical deficiency. And even if I simply assumed his beliefs about his capacity were true, there is no expert evidence in this case showing what the actual work Petitioner *could* have performed was.

Accordingly, it is difficult at the outset to determine, at a minimum, *what* lost earnings he should receive for at least the January 2017 – May 2018 timeframe. He cannot assume that the "best" he could have done was the RV job he began in the spring of 2018, and he has offered no expert evidence to substantiate this. (In fact, the calculations are provided only in *Petitioner's* own declaration—an especially unpersuasive way to substantiate a lost wages claim, given their inherent complexity). In addition, Petitioner has not offset his claim for this period with the two disability payments her received.[7] At best, Petitioner can compare his actual earnings at the RV park with what he would have expected to make at Revels, through the time in May 2022 when he was at least capable of being rehired, based on a medical evaluation he received at that time. Again, however—he cannot and has not shown that his actual work was the best for which he was able. In addition, the calculation provided includes no offsets, although his Reply does seem to allow for them.

As previously mentioned, Petitioner has offered his own witness statements detailing the impact his injury purportedly had on his ability to function day-to-day in a work environment, as well as the purported calculations for his "top salary as a non-radiological machine installer." But I do not find that such witness statements or wage loss narratives aid in the filling of the clear evidentiary gaps presented herein. These evidentiary gaps needed instead to be addressed by persuasive testimony from a vocational specialist, but Petitioner has not offered such an expert, despite *more* than a reasonable opportunity to do so.[8] In many vaccine cases, petitioners have

---

[7] Respondent's argument that Petitioner abandoned a potential worker's compensation claim is not meritless either. But based on the record as provided, I cannot discern if the claim should be deemed as unreasonably abandoned or unlikely to succeed. Regardless, it remains a *petitioner's burden* to substantiate his lost earnings claim—and the existing record does not justify his total decision to go without employment for approximately eighteen months, even if he is correct that he was unable to fully perform his tasks at Revels.

[8] As mentioned previously, this claim was initiated July 2019, and in November 2022, I issued a Ruling on Entitlement, finding Petitioner entitled to damages. Thereafter, I directed the parties to file a Joint Status Report indicating the categories of damages that have been agreed upon, and any that remain undecided at that time. *See* Scheduling Order, dated Dec. 6, 2022. On March 31, 2023, the parties filed their Joint Status Report, and I subsequently ordered the parties to file an additional Joint Status Report either proposing a briefing schedule on the issue of damages or indicating their wish to have a damages hearing instead. *See* Scheduling Order, dated Apr. 24, 2023. A briefing schedule was set on April 26, 2023. *See* Scheduling Order, dated Apr. 26, 2023. Thus, Petitioner has

utilized vocational experts to establish their inability to work post-vaccination injury at the same level as before. *See e.g.*, *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at *11 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (citing *Petronelli v. Sec'y of Health & Hum. Servs.*, No. 12-285V, 2016 WL 1085455, at *2 (Fed. Cl. Spec. Mstr. Feb. 22, 2016) (discussing opinion from the petitioner's vocational expert that given petitioner "physical and mental limitations noted in the record, it seemed 'unlikely' that petitioner would be capable of maintaining gainful employment on either a part-time or full-time bases."). Here, no such evidence has been offered.

Therefore, I find that Petitioner has failed to adequately substantiate the notion that his "earning capacity has been impaired by reason of … his vaccine injury" as required by Section 15(a)(3)(A). Petitioner's calculations are simply too speculative—both in proposing what his "top salary" as a non-radiological machine installer would be, and also in setting a "floor" by establishing the highest wage he could have earned during the relevant time period. As such, the calculations contained in his own witness statements do not meet the "generally recognized actuarial evidence and projections" standard set forth by Section 15(a)(3)(A). Petitioner has had ample time to employ an expert to further assist him in the required showing but has not done so.

Thus, the record lacks preponderant support for an award of lost wages/earnings, and no such award will be permitted.

## CONCLUSION

Based on the entire record in this case, I find that Petitioner is entitled to the following damages components: (a) $130,000.00 in actual pain and suffering, and a Medicaid lien sum in the amount of $6,342.93. On or before April 5, 2024, Petitioner will file a statement indicating the address to which the Medicaid lien sum shall be paid, and I will thereafter issue a damages decision.

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

had almost a year to substantiate this aspect of his claim with the relevant expert input.